# UNITED STATES DISTRICT COURT
for the
_____ District of _____

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  23MJ0885-MDD
 )
 )
 )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
 ❒ evidence of a crime;
 ❒ contraband, fruits of crime, or other items illegally possessed;
 ❒ property designed for use, intended for use, or used in committing a crime;
 ❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

 *Code Section*              *Offense Description*

The application is based on these facts:

 ❒ Continued on the attached sheet.
 ❒ Delayed notice of \_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

 *Travis Desmond*
 *Applicant's signature*

 _____
 *Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ *(specify reliable electronic means)*.

Date: _____   *Mitchell D. Dembin*
 *Judge's signature*

City and state: _____
 *Printed name and title*

# AFFIDAVIT

I, Special Agent Travis Desmond, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> A Blue Nokia cellular device
> Seizure No. 2023302800001301-0032
> ("**Target Device 1**")
> as described in Attachment A-1;
> and,
>
> A White Apple i-Phone cellular device
> Seizure No. 2023302800001401-0005
> ("**Target Device 2**")
> as described in Attachment A-2;
> and,
>
> A Green Cricket Wireless cellular device
> Seizure No. 2023302800001401-0006
> ("**Target Device 3**")
> as described in Attachment A-3;

and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841 and 846 as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Ricardo ORIZABA ("Defendant") for possessing with the intent to distribute approximately 1.8 kilograms of heroin, and 2.25 kilograms of fentanyl within the United States. The Target Devices are currently in the custody of Homeland Security Investigations and located at 880 Front Street, Suite 3200, San Diego, California 92101, in the Southern District of California.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a Special Agent with Homeland Security

Investigations (HSI) since February of 2019. I am currently assigned to the HSI Office of the Special Agent in Charge, in San Diego, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

4.     During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import and distribute narcotics into and within the United States from Mexico at Ports of Entry.

5.     I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States.

6.     Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions

set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

  a. tending to indicate efforts to distribute controlled substances within the United States;

  b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

  c. tending to identify co-conspirators, criminal associates, or others involved in distribution of controlled substances within the United States;

  d. tending to identify travel to or presence at locations involved in the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

### FACTS SUPPORTING PROBABLE CAUSE

#### Overview

7. Homeland Security Investigations (HSI) is investigating a Drug Trafficking Organization (DTO) based in Yakima, Washington and Visalia, California that recruited drivers to cross drugs into the United States and distributed those drugs to various locations

within the United States. Narcotics couriers who have been charged in this investigation include Ricardo ALFARO, Marco BUSTOS, Jaime MALDONADO, and Nicholas PINA. Witness interviews and consensual and court-authorized searches of cell phones used by those couriers revealed that the couriers were recruited and managed by Benjamin MADRIGAL aka "Tony." Between the summer of 2021 through September 2022, MADRIGAL was assisted by Cesar MURILLO and Mayra HERNANDEZ, who sent wire transfers to load drivers, received narcotics and bulk cash, and dispatched load drivers to destinations within the United States.[1] MADRIGAL was also assisted by Ricardo ORIZABA, who distributed narcotics in the Yakima, Washington area, and served as an "enforcer" for MADRIGAL to prevent other members of the DTO from cooperating cooperation with law enforcement. Agents interviewed MURILLO and HERNANDEZ in late August 2022. Witnesses state that within days of that interview, MADRIGAL ordered ORIZABA to kill MURILLO and HERNANDEZ, and that ORIZABA shot MURILLO and HERNANDEZ and buried them in a vacant field outside of Yakima, Washington. MURILLO and HERNANDEZ disappeared in early September 2022 and have had no contact with associates and relatives since that date.

8. On February 8, 2023, agents executed a search warrant on ORIZABA's residence in Parker, Washington, which is in the greater Yakima, Washington area, and seized fentanyl, multiple firearms including an AR-15 assault rifle and a 9mm handgun with an attached suppressor, ammunition, high-capacity magazines, a scale, an electronic money counter, approximately 11,000 fentanyl pills weighing 1.337 kilograms, 1 kilogram of fentanyl powder, 1.7 kilograms of heroin, and the three **Target Devices**. The **Target Devices** were sent from Yakima, Washington to San Diego, California for forensic analysis

---

[1] MADRIGAL is currently charged in the District of Oregon (Case No. 22-CR-76) with possession with intent to distribute fentanyl and methamphetamine and is a fugitive from that case. He was arrested on June 19, 2021 as the passenger in a vehicle that contained approximately 55 pounds of methamphetamine, 953 grams of cocaine, and one kilo of fentanyl. MADRIGAL was initially charged in state court and failed to appear and has been a fugitive since that time. He was indicted in the District of Oregon on March 3, 2022.

upon issuance of the search warrants requested in this affidavit.

## Origin of the investigation

9. This investigation originated with the seizure of narcotics from three vehicles at California ports of entry, and one vehicle on a Colorado freeway, between September 9, 2021, and October 18, 2021. The chart below sets forth the drivers, the date and place where drugs were seized, and the type and quantity of drugs:

| Defendant | Date/place drugs Seized | Type/quantity of drugs |
|---|---|---|
| Ricardo ALFARO[2] | 9/9/21, Otay Mesa POE | 29.84 kgs meth, 5.5 kgs fentanyl |
| Marco BUSTOS[3] | 10/18/21, San Ysidro POE | 13.00 kgs fentanyl, 10.06 kgs cocaine, .48 kgs. Meth |
| Nicholas PINA[4] | 9/16/21, Grand Junction, CO | 26.8 kgs meth |
| Jaime MALDONADO[5] | 9/28/21, San Ysidro POE | 31.8 kgs meth, 5.34 kgs fentanyl |

As noted, each of those drivers has been charged with a narcotics offense in the Southern District of California

10. I later determined that Fernando GOMEZ, who was arrested on August 5, 2021 (SDCA Case No. 21-CR-2988-AJB) for importing approximately 15 kilograms of methamphetamine from Mexico into the United States, is also associated to this investigation. During a debrief, GOMEZ stated he was recruited by "El Guero" in Visalia, California to smuggle drugs. GOMEZ stated El Guero frequented Visalia, CA and Yakima, WA. El Guero was later identified as Gilberto ORTIZ. An image of ORTIZ was discovered inside GOMEZ's cell phone. GOMEZ then recruited his friends, BUSTOS and PINA. GOMEZ stated he drove a drug load vehicle to a house Yakima, Washington. ORTIZ died of a drug overdose in the Spring of 2022. As set forth below, witnesses state that following ORTIZ's death, MURILLO took on leadership responsibilities in Yakima until MURILLO

---

[2] SDCA Case No. 21-CR-2869-CAB.
[3] SDCA Case No. 21-CR-3211-JLS.
[4] SDCA Case No. 22-CR-2700-RBM (currently a fugitive).
[5] SDCA Case No. 21-CR-3006-BAS.

disappeared in early September 2022.

### Identifying MADRIGAL as the load driver coordinator

11.  Pursuant to either a warrant or consent, or both, agents downloaded cellular phones used by ALFARO, BUSTOS, Rafael LOYA (BUSTOS' passenger and co-defendant), PINA, and GOMEZ. Each of those phones had contact with the number (509) 388-4344 (the 4344 number). GOMEZ saved the 4344 number under the contact name Tony@work. Text messages contained in GOMEZ's phone show that the 4344 number provided direction to GOMEZ during successful smuggling runs in the United States prior to GOMEZ's arrest. ALFARO saved the 4344 number as "Mr. T." Text messages in ALFARO's phone show that the 4344 number provided direction to ALFARO during successful smuggling trips prior to ALFARO's arrest. PINA saved the 4344 number as "T." PINA's phone also shows the 4344 number providing direction to PINA during successful smuggling trips prior to PINA's arrest in Grand Junction, Colorado.

12.  In addition, between July 32, 2021, and September 16, 2021, the 4344 number exchanged 528 phone calls, text messages, and voice messages with PINA's phone. Between July 22, 2021, and "August 5, 2021, (the day GOMEZ was arrested) the 4344 number exchanged 173 calls, text messages, and voice messages with GOMEZ's phone. Between August 13, 2021, and September 16, 2021, the 4344 number exchanged 111 calls, text messages, and voice messages with BUSTOS' phone. Between August 16, 2021, and August 28, 2021, the 4344 number exchanged 50 calls, text messages and voice messages with ALFARO's phone. The 4344 number also had 16 contacts with the phone believed to be used by ORTIZ, the deceased former leader of the organization in Yakima, Washington, along with numerous other numbers that were also in contact with load drivers and other persons who exchanged wire transfers with members of the organization.

13.  Two sources of evidence tie MADRIGAL to the 4344 number. First, during an interview, Deliyla HERNANDEZ stated that she contacted MADRIGAL on the 4344 number on numerous occasions in 2021. Deliyla HERNANDEZ is MAYRA

HERNANDEZ's daughter and was formerly in a relationship with MADRIGAL. Second, GOMEZ's phone had a photo of a Washington state drivers license with MADRIGAL's photo bearing the name "Sebastian Torres." Subpoena's served on Money Gram show that on September 21, 2021, "Sebastian Torres" used the 4344 number to send a 1,000 wire to Raquel Madrigal, MADRIGAL's sister.

**Proffer of Julio VARGAS and MADRIGAL's order to ORIZABA to murder MURILLO and HERNANDEZ**

14. On December 8th, 2022, HSI and DEA agents conducted a proffer with Julio VARGAS-Birrueta. VARGAS was previously linked to this DTO and investigation after his name was discovered on an insurance card from a seized Infiniti Q50 in Yakima, WA that was used by this DTO. VARGAS was arrested by DEA Stockton in California and mentioned knowing about a killing that occurred in Yakima, WA after agents conducted several warrants in the area.

15. VARGAS said he was MADRIGAL's cousin, and that MADRIGAL was the leader of the DTO after the death for former leader, ORTIZ. VARGAS identified ORTIZ and MADRIGAL from a photo lineup. Agents showed VARGAS a picture of MURILLO and asked if he knew who the person. VARGAS identified MURILLO as a former member of the DTO and said MURILLO was murdered in Yakima, Washington in September 2022.

16. VARGAS said that MADRIGAL called him (VARGAS) approximately 30 minutes after killing MURILLO and his spouse, Maira HERNANDEZ, and provided precise details.

17. MADRIGAL told VARGAS that it all started after HERNANDEZ's daughter, Deliyla Hernandez, contacted MADRIGAL to inform him that MURILLO was talking to law enforcement. (I interviewed MURILLO and HERNANDEZ on August 22 and 23, 2022.) After MADRIGAL heard this, MADRIGAL confronted MURILLO. MADRIGAL met with MURILLO, searched MURILLO's cell phone, and found text messages between MURILLO and HERNANDEZ discussing how they were going to cooperate with law enforcement and potentially give law enforcement MADRIGAL's

location. After seeing this, MADRIGAL became enraged and drove MURILLO to a ranch outside of Yakima. Agents served a federal search warrant on the property on September 8, 2022, and seized over 30 assault rifles.

18. VARGAS said that MADRIGAL told him, VARGAS, that once at the ranch, ORIZABA shot MURILLO to death with an AK-47 style assault rifle. ORIZABA did this at MADRIGAL's direction. VARGAS said that ORIZABA does of all MADRIGAL's "dirty work" and that MADRIGAL told him ORIZABA was the shooter. VARGAS said that there were other people there who witnessed the murder, but he did not provide their names. Agents showed a picture of ORIZABA that was taken during the surveillance in Wapato, WA. VARGAS confirmed the person in the photograph was ORIZABA.

19. After ORIZABA killed MURILLO, MADRIGAL contacted HERNANDEZ in order to get her to come to the ranch style property to meet MURILLO. VARGAS said that MADRIGAL used a "ruse" to get HERNANDEZ to the ranch.[6] Once HERNANDEZ was at the ranch, ORIZABA shot HERNANDEZ to death with the same AK-47 style assault rifle. MADRIGAL, ORIZABA, and other unknown coconspirators used a commercial grade backhoe to bury the bodies deep underground. Then they used the backhoe to move large amounts of dirt around the property to make it more difficult for the bodies to be recovered. (During the search warrant on September 8, 2022, agents observed a commercial grade backhoe located on the property). Agents asked VARGAS if the weapon used to murder HERNANDEZ and MURILLO was seized by agents during the search warrant and VARGAS stated "no," ORIZABA had concealed the firearm in a separate area.

---

[6] Deliyla HERNANDEZ substantially corroborated this version of events. She told agents that after MURILLO went to the ranch, MADRIGAL asked her (Deliyla) to take Mayra HERNANDEZ to a hotel parking lot in Yakima, Washington where he would take her to a nearby residence. Deliyla HERNANDEZ drove her mother, Mayra HERNANDEZ, to the hotel where MADRIGAL was waiting. Mayra HERNANDEZ got into MADRIGAL's car. However, rather than drive in the direction of the residence, Deliyla saw MADRIGAL take her mother in the direction of the ranch outside of Yakima. That was the last time Deliyla HERNANDEZ saw Mayra HERNANDEZ.

20. VARGAS stated that the ranch was used to store, weigh, separate, package and distribute narcotics. Vehicles containing concealed narcotics would drive to the ranch and have the narcotics removed from the vehicles and stored on site until it was distributed. VARGAS stated he had visited the ranch style property numerous times and had first-hand knowledge of the purpose of its location.

### Interview of Yareli BANUELOS

21. On December 9, 2022, HSI agents interviewed Yareli BANUELOS, the former spouse of deceased ORTIZ who formerly led the organization in Yakima.

22. BANUELOS was shown a picture of two individuals and identified one of the males as "Ricky" (ORIZABA). BANUELOS said that ORIZABA worked for her late husband prior to his death and now works for MADRIGAL, the current leader of the DTO. BANUELOS said when ORIZABA worked for ORTIZ, he [ORIZABA] took care of the animals and moved drugs. BANUELOS said ORIZABA has been out to the ranch location and she accused ORIZABA of stealing equipment from the ranch after her husband's death.

23. BANUELOS said ORIZABA lives near Wapato but she doesn't know the exact location. BANUELOS doesn't know his current role but said she's seen some of the people he associates with, and they are "bad people." BANUELOS appeared to be afraid of ORIZABA.

### Search warrant of 321 Yakima St and arrest of ORIZABA

24. On January 30, 2023, the Honorable Alexander Ekstrom, U. S. Magistrate Judge signed a federal search warrant (23MJ04020-ACE) authorizing a search 321 Yakima Street.

25. On February 8, 2023, HSI agents conducted surveillance at 321 Yakima Street in preparation for the execution of the search warrant. Agents observed ORIZABA exit the residence and enter a black Chevy Camaro and depart the location. Agents then contacted ORIZABA as he was stopped in a parking lot. During a post-consent search, agents discovered multiple firearm magazines and ammunition inside the vehicle along with **Target Devices 2 and 3** (found in the center console of the vehicle). ORIZABA stated that

the devices belonged to him.

26. During the traffic stop of ORIZABA, agents simultaneously executed the federal search warrant at 321 Yakima Street where they seized the narcotics, firearms, and other items referenced above. ORIZABA was arrested and charged in the Eastern District of Washington with Possession with Intent to Distribute Fentanyl 21 U.S.C. §§ 841 and Possessing a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. § 924(c) (EDWA Case No. 23-CR-2005).

27. **Target Device 1** was found and seized by an HSI agent who was tasked to perform a search of ORIZABA' residence. **Target Device 1** was located in a room of the ORIZABA's residence where agents encountered ORIZABA's spouse, Lizbet Torres, and where agents discovered and seized multiple firearms and illicit controlled substances. Torres told agents that ORIZABA used **Target Device 1**.

28. Following his arrest, ORIZABA was ordered detained in a detention center in Yakima, Washington. Agents listened to his consensually-recorded calls from the detention center and, among his first calls, agents heard ORIZABA tell his sister to "call Tony" [MADRIGAL] and tell him what happened. Based on that call, I believe that ORIZABA continued to work with MADRIGAL up through as recently as February 8, 2023.

29. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Devices** to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a

defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on August 8, 2021, up to and including February 8, 2023.

## METHODOLOGY

30.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

31. Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

32. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

33. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

# CONCLUSION

34. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of Defendant's violations of Title 21, United States Code, Sections 841. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Travis Desmond*
Special Agent Travis Desmond
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 10 day of March, 2023.

_____
Honorable Mitchell D. Dembin
United States Magistrate Judge

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

>A White Apple i-Phone cellular device
>Seizure No. 20233028000001401-0005
>("**Target Device 2**")

Target Device 2 is currently in the possession of Homeland Security Investigations, located at 880 Front Street, Suite 3200, San Diego, California 92101.

# ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of August 8, 2021, up to and including February 8, 2023:

a. tending to indicate efforts to distribution of controlled substances from within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in distribution of cocaine. fentanyl and methamphetamine, or some other federally controlled substance, within the United States;

d. tending to identify travel to or presence at locations involved in the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841, 846.